**PRINTING INDUSTRIES OF the GULF COAST et al.**

v.

**Honorable John HILL, Attorney General of the State of Texas, et al.**

**Civ. A. No. 73–H–1261.**

United States District Court, S. D. Texas, Houston Division.

Aug. 20, 1974.

Stay Granted Oct. 11, 1974.

See 95 S.Ct. 19.

Probable Jurisdiction Noted Dec. 23, 1974. See 95 S.Ct. 677.

Bue, J., concurred specially and filed an opinion.

Gerald M. Birnberg, Bellaire, Tex., for plaintiffs.

Penny J. Brown, Asst. Atty. Gen., Houston, Tex., Elizabeth Levatino, Austin, Tex., for defendants.

Before GEE, Circuit Judge, and SINGLETON and BUE, District Judges.

SINGLETON, District Judge.

In 1973 the 63rd Legislature of the State of Texas amended Article 14.10(b) of the Texas Election Code V.A.T.S., to provide as follows: "Any printed or published political advertising shall also have printed on it the name and address of the printer or publisher and the person paying for the advertising." Sanctions for the violation of the law are a fine of not less than $100 nor more than $5,000 or imprisonment of not less than one year nor more than five years or both fine and imprisonment.

Plaintiffs are a trade association consisting exclusively of persons engaged in the printing industry and three named individual printers. They have brought this suit pursuant to 42 U.S.C.A. § 1983, alleging that the quoted language is unconstitutional because it interferes with their right to political and associational privacy and anonymity and because it abridges the freedom of the press. Further, they allege that the statute is unconstitutionally vague and imprecise. The plaintiffs have alleged that they fear and have reason to fear intimidation, harassment, and reprisals if they are required to associate openly and publicly with certain political candidates or positions as required by the statute; they fear that persons seeing plaintiffs' names on political advertising will mistakenly believe that the plaintiffs endorse those candidates or positions whose printing they undertake, and in this way the statute has a chilling effect on the exercise of first amendment rights. Further, they allege that they were unable to determine the requirements of the statute in that the terms "person paying for the advertising" and "publisher" are not defined.

Jurisdiction is founded on 28 U.S.C.A. §§ 1331 and 1343, 2201 and 2202. The case is before this three-judge district court by virtue of 28 U.S.C.A. §§ 2281 and 2284.

## STANDING

The defendants have questioned the standing of the plaintiffs to rely on the rights guaranteed by the first amendment. The argument is that because there is no standing to assert the rights of third parties except in very narrow circumstances, the printers have no standing because the rights they seek to assert are those of third parties, the politicians and voters. The printers, it is said, are only "commercial conduits" who are injured, if at all, in the pocket book—their personal political speech and association rights remain untouched by the law. This court believes that the printers are personally injured by the law.

■■ The first amendment rights to freedom of speech and press exist not only because the authors of the Bill of Rights wished to humor the eccentricities of the man on the soap box but because they wished to secure forever the *means* of making the United States a free market place of ideas. The human voice and the human pen are vital to this goal but no more vital than the physical printing press itself and the persons who operate it. All of these rights exist because of the same goal. Who can say that in achieving the goal any one element is more important or that because one element has commerical aspects it lacks standing to protect itself. All of these rights are so closely bound together that the goal they were created to achieve will fail should any one be curtailed. To say that the right of the printer physically to print the written word can be distinguished from the right of the author to have his words printed because the printer has no interest in the ideas he prints (his interest being in receiving a fee for his printing) is to ignore not only the clear language of the first amendment but the scheme behind that amendment. Restrictions on the printer do impede the author, but the printer's rights are not derived from the author's rights. The printer's rights are related to those rights—both are derived from the same idea behind the first amendment. The idea behind the first amendment would be severely threatened were we to limit

the assertion of first amendment rights to the author-printer who both writes and prints his ideas. Protection of speech and authorship is firmly grounded on a national policy of protecting the rights of both the individual and the whole people. Printing and publication may not rest on as strong an *individual* support as speech and authorship, but because without question printing and publication advance the rights of the people to know and understand they are no less deserving of protection than speech and authorship. In this sense the rights of the printer and publisher are no more derivative than the rights of the speaker and author.[1]

During the 1930's the Supreme Court embarked upon a course which defined the first amendment guarantees and emphasized their importance. In all of the long line of cases there was one theme: "the belief of the framers of the constitution that exercise of the rights lies at the foundation of free government by free men." Schneider v. Irvington, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). Never, in these cases, are the rights in terms of personal rights purely for the sake of individual freedom, rather the rights are defined in terms of personal right for the sake of "free government by free men." This theme was not meant to diminish the obviously strong belief in individual freedom but to emphasize that individual freedom in the first amendment free-speech area is not cherished purely for its own sake but is cherished for the sake of all the people. It was seen as absolutely essential to the democracy which the founding fathers established. The language of these earlier cases makes quite clear that the Supreme Court which first articulated the first amendment protections we take for granted today never considered a "com-

mercial conduit" argument. In Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930), the Court cut down a Minnesota state statute which provided that a person or corporation which "regularly or customarily" produced, published, circulated, had in possession, sold, or gave away a "malicious, scandalous and defamatory newspaper, magazine or other periodical," could be found guilty of publishing, etc., a nuisance and have the nuisance enjoined. The court said:

> In attempted justification of the statute, it is said that it deals not with publication per se, but with the "business" of publishing defamation . . . . Characterizing the publication as a business, and the business as a nuisance, does not permit invasion of the constitutional immunity against restraint.

283 U.S. at 720, 51 S.Ct. at 632. It is true that in *Near* the publication existed only to put forth ideas of one group so that the publisher's case can be distinguished from the case of the independent contractor which we have here, yet the Supreme Court recognized that the first amendment gives to the press something which makes it more than a mere business.

In Grosjean v. American Press Company, 297 U.S. 233, 56 S.Ct. 444, 30 L. Ed. 660 (1935) there was an attempt to impose a license tax of 2% of the gross receipts of advertising of newspapers having a circulation of 20,000 or more per week. This was an attempt at regulating only the commerical aspects of a newspaper's operations, yet the Court did not hesitate to strike it down. Historically, taxation of the circulation of newspapers was a tool of repression, not because it took money from the pockets of the publishers but because it was a method of limiting "the circulation of information to which the public is enti-

---

1. To this court a printer is a person, natural or corporate, who for free or for a fee places for dissemination on paper, wood, or stone ideas be they his ideas or those of others. If this is a proper definition of a printer, certainly that person would be as entitled to the first amendment protection as any other person and could effectively raise the constitutional question and should be afforded the full protection of that great constitutional commandment.

tled in virtue of the constitutional guarantees." 297 U.S. at 250, 56 S.Ct. at 449. There was never any question of the standing of the plaintiffs in *Grosjean* to bring the suit which so directly involved them and to assert the first amendment as their protection.

What is more important, the Court stated the purpose of the first amendment:

> The grant of immunity here invoked was to preserve an untrammeled press as a vital source of public information . . . the suppression or abridgment of the publicity afforded by a free press cannot be regarded otherwise than with grave concern.

297 U.S at 250, 56 S.Ct. at 449. It is important to realize this when treating the instant case because in our zeal to secure individual first amendment rights it often becomes hard to see that the ideal of free men governed by free men is just as dependent upon the vehicle of free speech—a free press. Not just the freedom to write one's own tract, print it in one's basement, and distribute it on the street corner is at stake but the freedom to go to a printer in the business of printing what comes over the counter, pay him, and have printed one's tract is at stake. The purpose of the first amendment was to protect the person who only operates the press as much as the author-printer, not so much because otherwise the commerical printer might lose money but because without the printer many an author could not disseminate his ideas. Unless the mere printer has a right which is greater than that of the ordinary businessman, not only his self-interest will be harmed but the purpose of the first amendment will be defeated. It is in the public interest to keep printers in *business* and to keep speakers and writers speaking and writing. The public interest has historically been assertable not only by the individual author and speaker but by the printer and publisher as well.

Later cases bear out this analysis. Smith v. California, 361 U.S. 147, 80 S. Ct. 215, 4 L.Ed.2d 205 (1959), concerned a bookseller convicted of violating a Los Angeles city ordinance which made it illegal for any person to have in his possession an obscene or indecent book in any place where books were sold or kept for sale. The Court said:

> It also requires no elaboration that the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms [of speech and press]. It is of course no matter that the dissemination takes place under commercial auspices [cites omitted]. Certainly a retail bookseller plays a most significant role in the process of the distribution of books.

361 U.S. at 150, 80 S.Ct. at 217.

In Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1962), the standing question was dealt with in a footnote:

> Appellants' standing has not been, nor could it be, successfully questioned. The appellants have in fact suffered a palpable injury as a result of the acts alleged to violate federal law, and at the same time their injury has been a legal injury [cites]. The finding that the Commission's notices impaired sales of the listed publications, which include two books published by appellants, establishes that appellants suffered injury. * * * [A]ppellants are not in the position of mere proxies arguing another's constitutional rights. The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication [cite to *Lovell*] . . . . The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied.

372 U.S. at 64, n. 6, 83 S.Ct. at 636.

Plaintiff's standing in the *Bantam Book* case was more tenuous than in the

present case. There the publisher challenged a Commission set up by the state of Rhode Island to advise state book distributors and sellers. There was never any question of the standing of the distributor to challenge the Commission notices. The publisher's standing was easily found because "unless he is permitted to sue, infringements of the freedom of the press may too often go unremedied."

It is significant to this court that neither in Pittsburgh Press v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), nor in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), were the parties asserting the first amendment rights challenged on the basis of standing. Yet, in both cases it was not the editorial policy which was the subject of the suit but *advertisements*. True, the question in both became one of whether or not the advertisements might constitute unprotected "commercial speech," but this question was one on the merits, not one of justiciability.

■ To hold that the printers in this suit have no standing, it would be necessary to distinguish between the newspaper or book and the political pamphlet. Yet, in 1937 the Court settled that question:

> The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.

Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1937).

The Court reiterated this sentiment in Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966):

> The Constitution specifically selected the press, which includes not only

newspapers, books, and magazines, but also humble leaflets and circulars [cite to *Lovell*] to play an important role in the discussion of public affairs.

## TEST

Amicus Common Cause has questioned the test to be used in measuring whether or not a state election law is offensive to the first amendment. Common Cause suggests that since Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1973), the compelling state interest test is no longer viable. This is probably an incorrect reading of the *Branzburg* case. As Gerald Gunther pointed out in his "The Supreme Court, 1971 Term," 86 Harv.L.Rev. 1, 141 (1972):

> The Court stressed that the "investigation of crime by a grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen." This the Court found to be a "compelling" governmental interest to which the practice of calling reporters to testify bore a "substantial" relation.[25]

And then in footnote 25, Professor Gunther went on:

> The Court refused to indicate whether it considered the proper test to be whether the information sought bore a "reasonable" relation or a "substantial" relation to the government purpose. * * * But the Court proceeded to apply the latter test and held that the government had succeeded in satisfying it . . . .

Certainly, in the area of state control of the election process, the Court has been unwilling to point out that it is using the compelling state interest test, probably because the "administration of the electoral process is a matter that the Constitution largely entrusts to the states." Kusper v. Pontikes, 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260, 266 (1973).

In Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1972), the Court rejected a challenge to a

state's law which required a voter to enroll in the party of his choice at least thirty days before the general election in November in order to vote in the next subsequent party primary. One of the bases on which the statute was challenged was the assertion that it violated the voter's freedom to associate with the political party of his choice. The Court felt that the statute did not do this in any significant way. The law did not, for example, "lock" the voters into an unwanted preexisting party affiliation from one year to the next. Rather, it merely imposed "a time limitation on when the voters had to act in order to participate in their chosen party's next primary." States, it conceded, have an interest in setting time limits for an orderly election process.

Having rejected the argument that the requirement was more than a time limitation, the Court concluded by concerning itself with whether or not the time limit in and of itself could be said to be an onerous burden on freedom of association. Because the state had a reasonable justification for the statute, that is, to prevent "raiding" during primary elections, the statute was upheld. "The resulting time limitation in enrollment is thus tied to a particularized legitimate purpose, and is in no sense invidious or arbitrary." 410 U.S. at 762, 93 S.Ct. at 1252, 36 L.Ed.2d at 10.

In *Rosario*, the Court examined the quantum of restriction on associational rights, determined that it was insignificant, characterized the complained-of restriction, and then reexamined it in light of its relationship to the goal the state was seeking to accomplish.

The Court followed a similar procedure in Kusper v. Pontikes, *supra*, another challenge to a state's election laws. In examining the restrictions in *Kusper*, the Court found that it did have a substantial effect on associational freedoms. This finding seemed to change the subsequent analysis from the one in *Rosario*: "As our past decisions have made clear, a significant encroachment upon associational freedom cannot be justified upon a mere showing of legitimate state interest." 414 U.S. at 58, 94 S.Ct. at 308, 38 L.Ed.2d at 267. The Court goes on to distinguish the *Kusper* case from *Rosario* and to hold that *Rosario* itself indicates that the goals sought by Illinois in *Kusper* can be obtained by less drastic means. Although the Court has not articulated its standard in these election cases, by its reference to "past decisions," in *Kusper* it can be assumed that the compelling state interest test is alive and well, if in a slightly altered form. It must also be emphasized that these voter cases are factually quite different from the pure free-speech case with which we are faced here.[2]

█ Clearly, if the burden on first amendment freedoms is more than incidental, the Court will not employ a "rational" state interest or "particularized legitimate purpose standard," as it did in *Rosario*, but will return to a standard which is similar, if not identical, to the compelling state-interest test.

What is known as the compelling state-interest test is set forth in this language in Schneider v. Irvington, *supra*, at 161, 60 S.Ct. at 151:

In every case, therefore, where legislative abridgement of the rights is as-

2. In the recent case Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court addressed the problem of censorship of the mail to and from prisoners and the incidental burden on first amendment rights caused thereby. The Court said:
Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further

an important or substantial governmental interest unrelated to the suppression of expression . . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240.
To this court, the *Procunier* case demonstrates that the compelling state-interest test is still operative.

serted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.

With this test in mind, the merits of the case will be considered.

## MERITS—FIRST AMENDMENT QUESTION

The plaintiffs assert two interrelated rights: (1) the freedom to print political material anonymously, derived from the first amendment's guarantee of freedom of the press, and (2) the printers' personal rights to associational privacy, derived from the first amendment's guarantee of the right to freely assemble for the redress of grievances.

Historically, anonymous publications have been considered basic implements of the expression of unpopular ideas or political beliefs. In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Supreme Court judicially recognized the existence of a right to publish anonymously. *Talley* teaches:

Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rulers.

362 U.S. at 64–65, 80 S.Ct. at 538.

The Court expressly declined to pass on the validity of an ordinance or law limited in its purpose to the identification of those responsible for fraud, false advertising or libel, and decided the case on overbreadth. The purpose of the Texas election law is limited in purpose and cannot be said to be overbroad precisely in the *Talley* sense. But by placing a major part of the burden of identification on the printer, the legislature has failed to rid the statute of all that the Court found obnoxious in the *Talley* ordinance.

■ The Court said in *Talley*: "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." 362 U.S. at 64, 80 S.Ct. at 538. The instant law restricts freedom to print, thereby freedom of expression. If he must place his name on the advertisement, the printer may decline to print matter submitted to him by dissident or unpopular groups for fear of official or unofficial reprisals which may be thrust upon him. This is a substantial infringement.

■ Furthermore, the printer, being the man in the middle, is hardly one upon whom to place the burden of policing the Texas Election Code. Precise regulation in the first amendment area would seem to dictate that, as *Talley* suggests, the legislature should seek directly to denounce and punish the campaign tacticians who may utilize the printing press for fraudulent purposes. By drawing the printers into the net the state seeks to utilize them to make the job of investigation simpler, but at the same time it destroys the constitutional guarantee of anonymity. The printers must be left to enjoy anonymity unless there is some overriding governmental

interest. Simplicity of investigation does not constitute this overriding interest.

Closely connected with the printers' rights as printers to print anonymously are the printers' rights as persons to associational privacy. Case law has established that forced disclosure of membership in a particular group may well violate the first amendment's guarantee of the free assembly. The Court has expressed the idea in this way:

> It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved [taxes on newspapers; regulations of labor unions; investigating lobbying]. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations . . . . Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order.

NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958). Logically, if it burdens one to be compelled to disclose associations, it must also burden one to be forced to associate oneself with an organization with which one is not in political or philosophical sympathy. "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom [to associate with others for the common advancement of political beliefs and ideas]." Kusper v. Pontikes, supra, 414 U.S. at 57, 93 S.Ct. at 307, 38 L.Ed.2d at 266. It could be said that the kind of associational disclosure contemplated by amended art. 14.10(b) is even more of a burden upon the person's first amendment rights.

■ Article 14.10(b) infringes on the right of associational privacy by creating a great probability that persons seeing the printers' names on political advertisements will mistakenly consider the name an endorsement of the candidate. Whether the printer desires the fact publicly known or not, the statute requires the printer to reveal that he has been of some assistance to the candidate. Indeed, the one who reads the publication may be unaware of the law which requires the printer to disclose his identity and may assume he did so voluntarily.

■ The State has countered with the argument that both these burdens can be avoided by the printing of a disclaimer, but disclaimers are not a solution for two reasons. In the first place, the statute refers to all political advertisements. There might well be room for a disclaimer on some advertisements but bumper stickers, for example, leave little room for such. Neither does a small pamphlet have much room to contain the political message, the required disclosure, and an accompanying disclaimer. In the second place, disclaimers may well be ineffective. The fact that one disavowed in a disclaimer the ideas and ideals of the Communist Party, for example, would not put to rest the notion in the minds of many persons that the printer had nevertheless *assisted* the Communist Party in making its presses available to the party.

■ The State concedes that art. 14.-10(b) does place a burden on these first amendment rights of plaintiffs but asserts that this does not automatically invalidate the law. The question to be decided at this juncture is whether or not a substantial burden is placed upon the first amendment rights of the plaintiffs. Article 14.10(b) demands that they abandon their right to print anonymously and their right of associational privacy if they chose to print political advertising and avoid criminal prosecution. They have demonstrated under oath a legitimate, bona fide fear of intimidation, harassment, and reprisal, both economic and physical, if they are required to print their names on all political adver-

tising. Their choice is very likely to be one for associational privacy and anonymity. If this happens, not only will they lose the business of printing political advertising but those unpopular political parties who wish to have their materials printed will be left without the services of the printing press. Most important of all, the underlying policy behind the first amendment is defeated.[3]

It is also important to remember that the rights of the first amendment will be curtailed at a time when they are most vital—during an election campaign. Surely, if the first amendment was designed to assure a free government by free men, then the political discussions of an election year are the most important of all. Yet, the State would curtail these discussions precisely at that time. That this state of affairs places a substantial burden upon the first amendment is clear to this court and needs no further elaboration.

It is equally as clear that the justification offered by the State of Texas is not substantial, paramount, or compelling enough to justify this burden upon the first amendment, in light of the distinct possibility that the State can fashion alternative means for discovering the identity of those who abuse the election process.

> [A]dministration of the electoral process is a matter that the Constitution largely entrusts to the States. But in exercising their powers of supervision over elections . . . the States may not infringe upon basic constitutional protections.

Kusper v. Portikes, *supra*, 414 U.S. at 57, 94 S.Ct. at 307, 36 L.Ed.2d at 266. *Cf.* Mills v. Alabama, *supra*. The State has alleged that the statute in question is necessary in several ways to the or-

derly election process. Amicus Common Cause alleges many more. Essentially, the argument is that by requiring the printer to put his name on the political advertisement and requiring him to keep a record of the name and address of the person who paid for the advertisement, the State and the public have an easy way of identifying persons responsible for the advertisements. There are basically four reasons why the identification of persons responsible for advertisements is deemed desirable:

1. Responsibility for fraudulent, deceitful, libelous, or falsely attributed statements in political advertisements can be ascertained.

2. The informed voter is entitled to know who is supporting particular candidates or positions and what "media companies" are molding the image of the candidate.

3. The opposing candidates are in a better position to reply to campaign accusations.

4. The actual advertising expenditures of candidates are more easily determined by both the State and the public.

In essence, the State seeks to go through the printer to obtain information about questionable or illegal activities, or to give the public and the opposing candidates information about the persons responsible for the candidacy or image of any particular candidate.

As laudable as these goals may be, the method is rife with fatal flaws. The State would have this court believe that these few lines of the Election Code constitute the linchpin of the scheme of the Code; yet, for the most part, the printers are nothing more than middlemen.

Initially, it must be remembered that there is no affirmative penal sanction in

---

3. Not only direct but indirect abridgment is forbidden. Taxing (*Grosjean*) and licensing (*Lovell*) have been held restraints. So has the requirement that to receive a certain form of mail one must request it be delivered. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Nor must the statute, to be declared

unlawful, have behind it the purpose to restrict the publication or dissemination of ideas. The fact that a statute may have a salutary purpose has no bearing on whether or not it should be held unconstitutional. *Cf.* Mills v. Alabama, 384 U.S. 214, 219–220, 16 L.Ed.2d 484, 488–89.

Texas for campaign "dirty tricks." So long as the printer prints some identity for the trickster and his own identity, presumably he is free from any sanction. Even if there were affirmative penal sanctions, since there is no requirement that the printer research the identity of the person who submits the advertisement for printing, there is no assurance that the campaign trickster's identity will be his true identity. The goal of prevention of campaign "dirty tricks" is not likely to be achieved by art. 14.10(b).

Secondly, the informed voter-candidate policy, laudable as it is, is not sufficient to justify substantial infringement on first amendment freedoms. *Cf.* Thomas v. Collins, 323 U.S. 516, 538, 65 S.Ct. 315, 89 L.Ed. 445 (1944) and Lewis v. Baxley, 368 F.Supp. 768 (three-judge ct. M.D.Ala.1973). The statute also provides that the identity of the person paying for the advertisement be disclosed, with a view to enabling the voter to vote more effectively. The identity of the printer coupled with his list of advertisers is supposed to provide the opportunity of a double check on who the advertisers are; yet, how meaningful that opportunity is, in light of the possibility that dishonest tricksters will not truly identify themselves, remains a question.

The argument that the amount of campaign expenditures can be better ascertained does seem the most plausible use for the statute, but it also sweeps too broadly. For example, the printers could be required to keep records of the expenditures of candidates and report them to the state authorities, without printing their identity on the very advertisements. True, a candidate or a member of the general public who wishes to find out how much the candidate spends on a particular item of advertising may have an easier time of it if he can call the printer directly, but a call to Austin, where such records might be kept, is not such an impossibility that it justifies the burden on the printers' first amendment rights.

The plaintiffs in this case are not asserting an absolute privilege of associational privacy and anonymity. They fear the consequences of a disclosure statute which requires them to publish in close proximity to the political sentiments advertised their names and addresses. This court believes that the requirement places a substantial burden upon the printers personally and upon the first amendment itself. The defendants have suggested that the only burden upon the plaintiffs is economic and, therefore, unprotectable. To reach such a conclusion we would have to discard the language of a long line of Supreme Court cases which deal with the first amendment rights of newspapers and booksellers. *Cf.* Near v. Minnesota, *supra*; Bantam Books v. Sullivan, *supra*; Grosjean v. American Press Co., *supra*; Smith v. California, *supra*; Pittsburgh Press v. Pittsburgh Commission on Human Relations, *supra*.

The statute here, which has the distinct possibility of curtailing the printing activities of some or all of these printers, is no less restrictive than the statute struck down almost forty years ago in *Grosjean*. That statute, too, affected the pocket book of the newspaper publisher; yet, the effect on the pocket book was quite logically seen to have a much more drastic effect on the future of publishing and the information to be received by the public. It was not the editorial content published by the newspaper which the court concerned itself with.

The fact that a reprisal may take an economic form does not cushion the reprisal or render the burden on the first amendment any less significant. In *Pittsburgh Press, supra,* the Court expressly limits itself to a situation in which financial ruin is not in question:

Nor does Pittsburgh Press argue that the ordinance threatens its financial viability or impairs in any significant way its ability to publish and distribute its newspaper.

413 U.S. at 383, 93 S.Ct. at 2558, 37 L. Ed.2d at 675–676. And, in NAACP v. Alabama, *supra*, the Court said:

> Revelation of the identity of its rank-and-file members has exposed those members to economic reprisals, loss of employment, threat of physical coercion, and other manifestations of public hostility.

357 U.S. at 462, 78 S.Ct. at 1172.

█ This court believes that the plaintiffs have demonstrated a probability of reprisals sufficient to engender in them a fear which significantly burdens their first amendment rights. The State's policy arguments are insufficient to overcome the substantial burden, especially since the statute, without the offensive clause, would operate in much the same way as it would operate with the clause. More importantly, it could be more narrowly drawn to achieve the State's desired goal.

## MERITS—VOID FOR VAGUENESS

█ Our decision that the statute quoted is overbroad has mooted the question of whether or not the undefined word "publisher" gives fair notice to printers. There remains, however, the question of whether or not the words "person paying for the advertising" is sufficient to apprise the printer of precisely whose name he is to place on the advertisement. Plaintiffs submit that the phrase could refer to a number of individuals, for example, the advertising agency paying the bills of the candidate, the campaign organization which is represented by the advertising agency, the person who donates the money earmarked for the advertisement, or the candidate himself, among others.

The plaintiffs point out further that the various interests which the election law seeks to advance would suggest a disclosure of the identity of a different person among the several choices available.

Article 14.10(b) which carries with it criminal penalties must be more explicit to stand. The printers must not be left to a guessing game.

The definition of "persons paying for the advertising" should be left to the legislature for definition, but as the statute now stands complying with it is almost impossible because it is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). For that reason, the phrase "person paying for the advertising" is unconstitutionally void on its face.

We conclude, therefore, that that portion of art. 14.10(b) of the Texas Election Code which reads: "Any printed or published political advertising shall also have printed on it the name and address of the printer or publisher and the person paying for the advertising," is unconstitutional and enjoin the State from its enforcement.

BUE, District Judge (specially concurring):

I concur in the result reached by the majority, even though I cannot join in the rationale employed in portions of the opinion. My decision regarding the constitutionality of article 14.10(b) is not based upon the denial of the First Amendment rights of the printers, since I do not believe they possess any, but rather upon the denial of the rights of persons who hire their services.

It is evident that the First Amendment protects not the written or spoken word itself, but the expression of ideas concerning social policy, political views, religious beliefs, etc. *See, e. g.*, Pittsburgh Press Co. v. Pittsburgh Comm. of Human Relations, 413 U.S. 376, 385, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); New York Times Co. v. Sullivan, 376 U.S. 254, 265–266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Accordingly, the protection of the First Amendment is not lim-

ited to authors or speakers, but extends as well to those who distribute the written word, Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L.Ed. 265 (1946); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), or who express ideas through other types of conduct. *See, e. g.,* Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). However, speech or conduct that expresses nothing of political or social importance is not subject to First Amendment protection. *See, e. g.,* Roth v. United States, *supra,* at 485; Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Karr v. Schmidt, 460 F.2d 609 (5th Cir. 1972). Thus, it is implicit in any consideration of First Amendment rights that a court determine what the speaker or actor is expressing and if this expression is worthy of First Amendment protection. In the instant case, the printers, by their actions, express nothing. They do not argue that they are denied the right to print anonymously their own views in support of or in opposition to a candidate. To the contrary, they seek the right to print anonymously that for which they have no feeling one way or the other. Indeed, they seek anonymity to avoid expressing any type of conviction. Nor do the printers seek to distribute ideas. They merely receive orders from their clientele and return the finished product to the person hiring their services.

In this regard, a printer is to be distinguished from the publisher of a newspaper. Both are similar in that they require the services of a printing press. However, there the similarity ends. It is inherent in every newspaper that editorial judgment is involved, not only in the expression of viewpoint contained on the editorial page, but also in the selection, rejection and placement of news items contained within its pages. *See* Pittsburgh Press Co. v. Pittsburgh Comm. of Human Relations, *supra* at 386, 93 S.Ct. 2553. Furthermore, a newspaper publisher is actively involved in the distribution of that which he prints. Contrary to the printer, he is not just a mechanical means of reproduction of the printed word.

Furthermore, I do not find, for much the same reasons as expressed above, that the printers' First Amendment right of association is violated by article 14.10(b). The right of association, like the right of free speech, is protected in order to promote the expression of ideas.

> It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech . . . . Of course, it is immaterial whether the beliefs sought to be advanced by the association pertain to political, economic, religious or cultural matters . . . .

N.A.A.C.P. v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958).

> The right of 'association,' . . . is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion . . . .

Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). In the instant case, however, the association of the printers and those who hire their services is not for the purpose of expressing any thoughts held by the printers; rather, it is purely a commercial relationship. Indeed, the printers seek anonymity because they do not necessarily hold the views of their customers. Purely commercial speech is not entitled to the protection of the First Amendment. *E. g.,* Valentine v.

Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). I do not believe that commercial association should be accorded any more sacred a position.

However, in holding that the printers have no First Amendment rights of their own in this situation, the importance of the printing press and the man who operates it is not to be underplayed. It cannot be questioned that his role in providing a means for expression is indispensable. But his importance as a means for the exercise of First Amendment rights for those hiring his services does not give him First Amendment rights beyond his own right of self-expression. Accordingly, a printer who merely performs a mechanical function is not exercising *his* First Amendment rights. In summary, the printers seek to print anonymously when they themselves are saying nothing and supporting nothing. Their actions cannot constitute "speech" as protected by the First Amendment.

Even though the action of the printers is not accorded the protection of the First Amendment, this does not preclude consideration of their challenge to the constitutionality of article 14.10(b). Although the statute in question may be constitutional as applied to the printers since they have no First Amendment rights, these same printers may still challenge the statute as facially unconstitutional. This is so because the bar to standing to assert such a challenge is traditionally disregarded when a statute dealing with First Amendment rights is attacked as facially unconstitutional for overbreadth. *See* Broadrick v. Oklahoma, 413 U.S. 601, 610–613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); United States v. Raines, 362 U.S. 17, 22, 80 S. Ct. 519, 4 L.Ed.2d 524 (1960). In cases falling within this narrow ambit, the Supreme Court has held that it will bypass its usual practice of considering first if the constitutional rights of the individual challenger have been violated and will consider the statute as a whole, regardless of whether its application to the challenger can be viewed as unconstitutional. *See* Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599, 612–26 (1962). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression," Broadrick v. Oklahoma, *supra* at 612, 93 S.Ct. at 2916. Accord Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L. Ed.2d 408 (1972); Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); N.A.A.C.P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1939); Mancuso v. Taft, 476 F.2d 187, 190 (1st Cir. 1973); LeFlore v. Robinson, 434 F.2d 933, 936 (5th Cir. 1970), vacated on other grounds, 446 F.2d 715 (1971).

Of course, the law's special treatment of the issue of standing in the First Amendment area does not mean that any person may challenge a statute concerning free speech. It is necessary that other relevant aspects of a "justiciable controversy" be present. *See* Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In any action involving a declaratory judgment as to the constitutionality of a state law, there must be sufficient adversity to warrant federal adjudication. See Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); Note, The First Amendment Overbreadth Doctrine, 83 Harv.L. R. 844, 863–64 (1970). Furthermore, although it is not necessary that the party challenging the statute be the subject of a criminal prosecution, *see* Doe v. Bolton, 410 U.S. 179, 188–189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), it is necessary that the plaintiff be subject to "a real threat of enforcement". Poe v. Ullman, *supra* at 507, 81 S.Ct. 1752.

In the case presently under consideration, it is readily apparent that we are concerned with a statute affecting, on its face, First Amendment rights of speech and press. Plaintiffs have challenged the statute because of vagueness and facial unconstitutionality. Unlike the challenged statute in *Broadrick*, article 14.10(b) is not concerned with the regulation of conduct, but with the regulation of speech itself in the form of printed material. Further, the threat of enforcement of the challenged statute is sufficiently real to deter the printing of anonymous literature and to support the printers' right to bring this action. Article 14.10(b) provides fines and imprisonment for noncompliance with its terms. The statute operates directly upon the plaintiffs in this action. Although the Court has been presented with no evidence of enforcement of the article's penal provisions, there is no indication that state officials intend to disregard the law. Accordingly, the plaintiffs have alleged a justiciable controversy, and it is necessary to consider the merits of their claims that article 14.10(b) is facially unconstitutional and void for vagueness.

While First Amendment rights are accorded a "preferred position" among Constitutional rights, Saia v. New York, 334 U.S. 558, 561, 68 S.Ct. 1148, 92 L. Ed. 1574 (1948), the right of free speech is not absolute. *See, e. g.*, Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L. Ed. 470 (1919). Thus, any consideration of the constitutionality of a statute allegedly infringing First Amendment rights first must involve a balancing test to determine if the interests of the state in regulating expression substantially outweigh those of the individual. To prevail, the state's interest, it appears, must be compelling. *See, e. g.*, American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744, 760 (1974); N.A.A.C.P. v. Button, 371

U.S. 415, 438, 83 S.Ct. 328 (1963). Once the state is found to have the requisite interest in regulation, a court must consider if this interest burdens unnecessarily other protected activities. *See, e. g.*, Grayned v. Rockford, 408 U.S. 104, 116–117, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). "Free expression 'must not, in the guise of regulation, be abridged or denied.'" *Id.* at 117, 92 S.Ct. at 2304, citing Hague v. CIO, 307 U.S. 496, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

In the instant case, we are faced with the task of balancing the interest of the state in preventing election fraud with that of the individual in publishing campaign literature anonymously. It is beyond question that the state has a compelling interest in preserving the integrity and orderliness of elections. *See, e. g.*, Storer v. Brown, 415 U.S. 724, 94 S. Ct. 1234, 39 L.Ed.2d 714, 725–726 (1974); Rosario v. Rockefeller, 410 U.S. 752, 761, 93 S.Ct. 1245 (1973); American Party of Texas v. White, *supra* at 761 n. 14, 94 S.Ct. 1296; Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Bullock v. Carter, 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). At the same time, it is well recognized that the individual has a right to exercise his First Amendment rights anonymously. *See* Talley v. California, 362 U.S. 60, 80 S. Ct. 536, 4 L.Ed.2d 559 (1960); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163 (1958). This right of anonymity is not, however, unqualified. *See* United States v. Harris, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (upholding Federal Lobbying Act requiring registration of paid Congressional Lobbyists and disclosure of contributions); Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1913) (upholding the required disclosure of publisher, editor, managers, etc., of newspaper seeking second class mailing privileges); Veterans & Reservists for Peace in Viet Nam v. Regional Comm'r., 459 F.2d 676 (3d Cir. 1972) (upholding licensing require-

ments of Trading with the Enemy Act); Wirtz v. Fowler, 372 F.2d 315 (5th Cir. 1966) (upholding the Labor-Management Reporting and Disclosure Act requiring report of activities of persons hired by employers to influence employees in organizing activities); Powe v. Miles, 407 F.2d 73 (2d Cir. 1968) (upholding college regulation requiring advance notice of demonstrations). *See also* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646 (1972) (grand jury can require disclosure of newspaper sources).

With full recognition of the state's interest in regulation of the election process, I concur in the conclusion of the majority that article 14.10(b) is unconstitutional in its overbreadth. I reach this decision after due consideration of the authorities cited above as examples of valid disclosure laws. In each instance *in which a disclosure statute has been upheld, the statute has been narrowly drawn to regulate only the narrow spectrum of activity that is necessary to protect the state's interest.* A private individual under the regime of the valid disclosure laws cited could still exercise his rights of expression anonymously. Article 14.10(b), however, is not limited to prohibiting election fraud. In seeking merely to facilitate the investigation of such fraud, it prohibits the anonymous publication of not only fraudulent literature, but all campaign literature, whether the contents be true or not. The prohibition of anonymous expression is thus direct and immediate. No individual seeking to have campaign material printed is immune from its application. Under article 14.10(b), it is not necessary that the party subject to the law seek some government benefit, such as second class mailing privileges, or that he be engaged in a specialized occupation, such as a paid lobbyist; nor does the prohibition become operative only if conduct as well as speech is involved, as in the case of a college demonstration. While a law directly prohibiting the publication of fraudulent literature would no doubt be constitutional, the state simply has no compelling interest in the prohibition of all anonymous campaign literature.

Although the state argues that article 14.10(b) is limited in that it applies only to election activities, I do not find that this limitation is sufficient to pass constitutional muster. Under no circumstances is the right of free expression more important than in the political arena, and no better opportunity is provided for the exercise of these rights than in an election. "[D]ebate on public issues should be uninhibited, robust, and wide-open, [even though] it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721 (1964). In the midst of the current zeal to prevent the fraudulent campaign practices that seem to have prevailed in the 1972 election year, *legislatures and courts should not lose sight of that which is most fundamental to our society.* The importance of the lone dissenter cannot be overestimated. To undermine the right to speak anonymously is to jeopardize this ability to dissent.

Thus, I am in accord with the view of the majority that article 14.10(b) is unconstitutional insofar as it requires the name of the printer or publisher to be published on all campaign material. Although the printer may have no First Amendment right to conduct his business anonymously, the disclosure of his name is primarily for the purpose of identifying the author or distributor of the printed material and constitutes an abridgment of the latter's First Amendment rights. By virtue of my decision regarding the ability of the plaintiffs to assert the First Amendment rights of others, my consideration of the challenged statute necessarily has been broader than that of the majority. Accordingly, I would hold further that the statute is unconstitutional in that it requires the name of the person paying for the advertisement to appear on the face of the material and thus abridges his First Amendment rights as well.