[Sac. No. 7547. In Bank. June 25, 1964.]

GEORGE CANON, Plaintiff and Appellant, v. THE JUSTICE COURT FOR THE LAKE VALLEY JUDICIAL DISTRICT OF EL DORADO COUNTY, Defendant and Respondent; THE PEOPLE, Real Party in Interest and Respondent.

Kingston & Carman, Ralph E. Kingston and Lynn Carman for Plaintiff and Appellant.

George Franklyn Duke, Michael L. Ohleyer and Marshall W. Krause as Amici Curiae on behalf of Plaintiff and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Charles A. Barrett, Assistant Attorneys General, James Ganulin, Deputy Attorney General, Jack R. Winkler, District Attorney, and George H. Dufort, Deputy District Attorney, for Defendant and Respondent and Real Party in Interest and Respondent.

PETERS, J.—By complaint filed in the justice court, appellant was charged with violating Elections Code section 12047.[1] That court overruled appellant's demurrer and

---

[1]Elections Code section 12047 reads:

"Every person is guilty of a misdemeanor who writes or causes to be written, printed, posted, or distributed any circular, pamphlet, letter, or poster which is designed to injure or defeat any candidate for nomination or election to any public office by reflecting upon his personal character or political action, unless there appears upon the circular, pamphlet, letter, or poster, in a conspicuous place, the name and address of the printer and either:

"(a) The name and address of the chairman and secretary or the names and addresses of at least two officers of the political or other organization issuing it; or

"(b) The name and residence address, with the street and number, if any, of some voter of this State, who is responsible for it."

denied his motion to dismiss, which urged, on various grounds, that appellant was constitutionally protected from prosecution under this statute. He then sought a writ of prohibition in superior court, attacking the jurisdiction of the justice court to try him under the statute. The superior court denied his petition. We hold that the writ must be granted because the statute is unconstitutionally discriminatory.

Prohibition, in this case, is a proper remedy. ■ It is well settled that when the claimed infirmity appears on the face of the statute, prohibition is an appropriate means to challenge the constitutionality of the statute. ■ The writ provides a speedy procedure by which the accused may be protected from prosecution under a statute which does not state a public offense. The courts, zealous to protect constitutional rights, have recognized the propriety of the use of the writ for this purpose. (*Whitney* v. *Municipal Court,* 58 Cal.2d 907 [27 Cal.Rptr. 16, 377 P.2d 80] ; *Lambert* v. *Municipal Court,* 53 Cal.2d 690 [3 Cal.Rptr. 168, 349 P.2d 984] ; see also *Kelly* v. *Municipal Court,* 160 Cal.App.2d 38, 46 [324 P.2d 990].) ■ Where the statute is attacked on First Amendment grounds the court is not limited in its examination to the application of the statute involved in the particular case, but may consider other possible applications of the statute. (*Fort* v. *Civil Service Com., ante,* p. 331 [38 Cal.Rptr. 625, 392 P.2d 385] ; *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093] ; see generally Note, *Inseparability in Application of Statutes Impairing Civil Liberties,* 61 Harv.L.Rev. 1208.)

■ There are certain challenges to this statute that are unsound. Thus the claim that section 12047 is unconstitutionally vague is without merit. The language of the section is understandable to people of ordinary intelligence and gives adequate warning of the conduct proscribed. It defines " '. . . boundaries sufficiently distinct for judges and juries fairly to administer the law. . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . .' " (*Roth* v. *United States,* 354 U.S. 476, 491-492 [77 S.Ct. 1304, 1 L.Ed.2d 1498, 1511] ; see Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67.)

■ Appellant next contends that the complaint is constitutionally defective in that it did not apprise him of the name of the victim of his alleged attack. While this might be

a ground for forcing the prosecution to amend the complaint, it is not a ground for dismissal, under California policy with respect to criminal pleadings. (See Pen. Code, § 956; *People v. Olf,* 195 Cal.App.2d 97, 107 [15 Cal.Rptr. 390]; Witkin, Cal. Criminal Procedure (1963) § 197, p. 185.) The complaint is not so defective as to deny appellant due process, particularly in light of the broad scope of discovery in criminal cases in this state. (See generally Traynor, *Ground Lost and Found in Criminal Discovery,* 39 N.Y.U.L.Rev. 228.)

One of appellant's main contentions is that section 12047 infringes on freedom of speech as guaranteed by the federal[2] and state[3] Constitutions. This contention, too, is unsound. It is our view that under the principles set forth in *Talley* v. *State of California,* 362 U.S. 60 [80 S.Ct. 536, 4 L.Ed.2d 559], and other recent cases, discussed below, enforcement of section 12047 does not unconstitutionally interfere with freedom of speech.

Section 12047 appears among the penal provisions of division 8 of the Elections Code, which is concerned with "Election Campaigns." It is one of several sections designed "to insure the fair and honest conduct of election campaigns,"[4] and to effectuate the mandate of our Constitution that "The privilege of free suffrage shall be supported by laws regulating elections and prohibiting, under adequate penalties, all undue influence thereon from power, bribery, tumult, or other improper practice." (Cal. Const., art XX, § 11.) The statute does not prohibit the communication of ideas, nor does it attempt to regulate the content of expression. It forbids only anonymity, on pain of conviction of a misdemeanor, with respect to a limited range of expression, to wit, those writings "designed to injure or defeat any candi-

---

[2]The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech, or of the press; ..." These freedoms are "secured against state invasion by the Fourteenth Amendment of the Constitution." (*Schneider* v. *State,* 308 U.S. 147, 154 [60 S.Ct. 146, 84 L.Ed. 155, 161]; see the analysis of the authorities in *Gibson* v. *Florida Legislative Com.,* 372 U.S. 539, 560, n. 2 [83 S.Ct. 889, 9 L.Ed.2d 929, 943] (concurring opinion).)

[3]"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." (Cal. Const., art. I, § 9.)

[4]This objective is the "apparent purpose of the 'Purity of Elections' Law." Report, Subcommittee on Purity of Election Laws, Assembly Journal, 1953 Reg. Sess., vol. 1, p. 541

date for nomination or election to any public office by reflecting upon his personal character or political action, . . .'' Thus the statute impinges upon full freedom of expression only during a limited period of time, for there can be candidates only during the period preceding an election.[5] More importantly, the section applies only to attacks on candidates, not to writings which are a communication of views about issues.[6] (Compare Elections Code section 12049,[7] a similarly worded section requiring identification of the source of campaign matter respecting ballot measures.)

The purpose of the statute is clear. It requires identification so that (1) the electorate may be better able to evaluate campaign material by examination of the competence and credibility of its source, (2) irresponsible attacks will be deterred, (3) candidates may be better able to refute or rebut charges — so that elections will be the expression of the will of an undeceived, well-informed public.[8] It is clear that the

---

[5]Although ''candidate'' is not defined, it should be construed in light of the policy favoring a construction which avoids constitutional doubts and in light of the fact that the major evil with which the statute is concerned is the smear attack on the eve of the election. A statute impinging on the right of free speech should be construed no more broadly than is absolutely necessary to accomplish its purposes. We need not now define ''candidate'' since we hold that the statute is invalid on other grounds.

[6]Again, since we hold the statute void on other grounds, we need not define with precision this distinction. The statute was not intended to inhibit writings which are chiefly an expression of ideas but instead was aimed at writings designed primarily to injure candidates by personal attacks rather than impersonal criticism of their views or official conduct. While there are, admittedly, some points at which such a distinction would be difficult to make, it is one which is constitutionally permissible. (Compare the distinction between defamatory speech relating to the private conduct of public officials and that relating to official conduct. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 737, n. 4, 11 L.Ed.2d 686] (concurring opinion), discussed below.) The phrase ''political action,'' would have to be construed as including only attacks which reflect upon the personal character of the candidate. We note, however, that an analogous federal statute, discussed below, is not limited as to type of statement, but rather it prohibits anonymous statements ''relating to'' candidates for specified offices.

[7]Section 12049 applies to all writings ''designed to promote either the passage or defeat of a measure. appearing on the ballot at any election.''

[8]''The subcommittee finds that the use of false, misleading or irresponsible literature in election campaigns is contrary to the public interest.'' (Report, Subcommittee on Purity of Election Laws, Assembly Journal, 1953 Reg. Sess., vol. 1, p. 539.)

integrity of elections, essential to the very preservation of a free society, is a matter "in which the State may have a compelling regulatory concern." (*Gibson* v. *Florida Legislative Com., supra,* 372 U.S. 539, 546 [83 S.Ct. 889, 9 L.Ed.2d 929, 935].) It was not the aim of the Legislature to hinder the communication of ideas, and there is nothing to indicate that the disclosure requirement, under the circumstances of present-day California politics, would in fact substantially inhibit expression, even in the limited area to which the statute is applicable. ▮ It was intended to deter the scurrilous hit-and-run smear attacks which are all too common in the course of political campaigns.[9] The primary concern is not for the candidate, however, although it is clearly in the public interest to create conditions conducive to the encouragement of good citizens to seek public office. The chief harm is that suffered by all the people when, as a result of the public having been misinformed and misled, the election is not the expression of the true public will. It is clear that this is an important problem today, as it was in 1901 when the section's statutory predecessor was passed.[10]

Other states, confronted with similar problems, have likewise enacted statutes designed to protect the integrity of elections. "Thirty-six States have statutes prohibiting the anonymous distribution of materials relating to elections." (*Talley* v. *State of California, supra,* 362 U.S. 60, 70, fn. 2 [80 S.Ct. 536, 4 L.Ed.2d 559, 566] (dissenting opinion); see Note, *Constitutionality of corrupt practices acts,* 69 A.L.R. 377.)

Congress, too, has found this type of legislation necessary. Section 612 of title 18 of the United States Code provides for a fine of not more than $1,000 and/or imprisonment of not longer than one year for the anonymous publication of a

---

[9] "If the present political campaigns are considered 'dirty,' one can only imagine the depths of depravity some candidates would go if this minimal protection did not exist. Hundreds of irresponsible anonymous smear sheets would blossom forth." (Report, Assembly Interim Committee on Elections and Reapportionment, 1961-62 (Jan. 1963) vol. 7, p. 51, No. 6.)

[10] "As a result of activities connected with the 1962 elections, the Assembly Interim Committee on Elections and Reapportionment has received a number of complaints regarding the circulation of campaign material and purported endorsements without the names and/or addresses of those responsible for the circulation." (Report, Assembly Interim Committee on Elections and Reapportionment, 1961-62 (Jan. 1963) vol. 7, p. 51, No. 6.)

"statement relating to or concerning any person who has publicly declared his intention to seek the office of President, or Vice President of the United States, or Senator or Representative. . . ." In a prosecution under this section, the defendant, relying on *Talley,* sought the dismissal of the indictment. The court held that the statute did not violate the First Amendment. (*United States* v. *Scott* (D.C.N.D. 1961) 195 F.Supp. 440, 443.) The statute was enacted, said the court, "So that the electorate would be informed and make its own appraisal of the reason or reasons why a particular candidate was being supported or opposed by an individual or groups." The court stressed that such disclosure enables voters to use their ballots more intelligently. It is to be noted that the federal statute is not limited in any manner as to the type of statement made.[11]

Having considered the language and purpose of the statute, we now pass to a discussion of its effect. ██ It is undisputed that by requiring disclosure it is likely to have some inhibitory effect. This, in itself, however, does not invalidate the statute. Not only have numerous federal disclosure statutes in various contexts been upheld, but analysis of the recent cases in which anonymity was protected indicates that anonymity is not an absolute. (See generally, Comment, *The Constitutional Right to Anonymity: Free Speech, Disclosure and the Devil,* 70 Yale L.J. 1084.) "In a number of situations in which secrecy or the concealment of associations has been regarded as a threat to public safety and to the effective, free functioning of our national institutions Congress has met the threat by requiring registration or disclosure." (*Communist Party* v. *Subversive Activities Control Board, supra,* 367 U.S. 1, 97 [81 S.Ct. 1357, 6 L.Ed. 2d 625, 689-690].) In *Communist Party,* the cases of *N.A.A.C.P.* v. *Alabama,* 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed. 2d 1488], and *Bates* v. *City of Little Rock,* 361 U.S. 516 [80

[11]In *Communist Party* v. *Subversive Activities Control Board,* 367 U.S. 1, 97-100 [81 S.Ct. 1357, 6 L.Ed.2d 625, 689-691], decided after *Talley,* this and other federal disclosure statutes were cited without question. See also the following statutes requiring disclosure: Federal Corrupt Practices Act, 43 Stat. 1070, 2 U.S.C. § 241 et seq., upheld in *Burroughs* v. *United States,* 290 U.S. 534 [54 S.Ct. 287, 78 L.Ed. 484]; Federal Regulation of Lobbying Act, 60 Stat. 839, 2 U.S.C. § 261 et seq., upheld in *United States* v. *Harriss,* 347 U.S. 612 [74 S.Ct. 808, 98 L.Ed. 989]; Post Office Appropriation Act of 1912, 37 Stat. 553, 39 U.S.C. § 4369, upheld in *Lewis Publishing Co.* v. *Morgan,* 229 U.S. 288 [33 S.Ct. 867, 57 L.Ed. 1190].

S.Ct. 412, 4 L.Ed.2d 480], which protected anonymity, were distinguished on the ground that in those cases "there was no showing of any danger inherent in concealment, no showing that the State, in seeking disclosure, was attempting to cope with any perceived danger." (*Communist Party* v. *Subversive Activities Control Board, supra,* 367 U.S. at p. 102 [81 S.Ct. 1357, 6 L.Ed.2d 625, at p. 692].) It is also to be noted that the court in *N.A.A.C.P.* v. *Alabama, supra,* did not overrule *New York* ex rel. *Bryant* v. *Zimmerman,* 278 U.S. 63 [49 S.Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785], which upheld the application to the Ku Klux Klan of a state statute requiring disclosure of membership lists. (*N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. at p. 465 [78 S.Ct. 1163, 2 L.Ed.2d at p. 150].) This latter decision was based on "the nature of the organization regulated, and hence the danger involved in its covert operation, . . ." (*Communist Party* v. *Subversive Activities Control Board, supra,* 367 U.S. at p. 101 [81 S.Ct. 1357, 6 L.Ed.2d. 625, at p. 692].) In *Bates* it was found, "On this record it sufficiently appears that compulsory disclosure . . . would work a significant interference. . . ." (*Bates* v. *City of Little Rock, supra,* 361 U.S. 516, 523 [80 S.Ct. 412, 4 L.Ed.2d 480, 486].) The same was true in *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 462-463 [78 S.Ct. 1163, 2 L.Ed. 2d 1488, 1499-1500]. There is no showing that any circumstances exist in California which would indicate a substantial likelihood of a significant inhibitory effect upon valid expression resulting from the disclosure requirement.

Nor did *Talley* hold that anonymity is always protected. It relied on *Bates* and *N.A.A.C.P.* for the proposition that "there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified." (*Talley* v. *State of California, supra,* 362 U.S. 60, 65 [80 S.Ct. 536, 4 L.Ed.2d 559, 563].) In *Talley* the ordinance was so broad as to bar "all handbills under all circumstances anywhere" which are issued anonymously. (*Talley* v. *State of California, supra,* 362 U.S. at p. 64 [80 S.Ct. 536, 4 L.Ed.2d at pp. 562-563].) The court expressly stated that it was not passing on the validity of an ordinance intended to and in fact limited to the accomplishment of valid purposes. (*Id.,* at p. 64 [4 L.Ed.2d at pp. 562-563].) Rather, the ordinance was held invalid "because the breadth of its application went far beyond what was necessary to achieve a legitimate governmental purpose." (*Shelton* v. *Tucker,* 364 U.S. 479, 489 [81 S.Ct. 247, 5 L.Ed.2d 231, 238].)

The crucial question, then, is whether the end to be achieved by the disclosure requirement justifies the resulting impairment of freedom of expression. Certainly, not every infringement upon freedom of speech, of whatever degree and without regard to any countervailing interest, is constitutionally forbidden. The cases relied on in *Talley,* besides *Lovell* v. *Griffin,* 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949], a prior restraint case, all clearly balanced the extent of the infringement with the governmental interest asserted in justification. *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 463 [78 S.Ct. 1163, 2 L.Ed.2d 1488, 1500], a unanimous opinion, stated "the final question" to be "whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association." *Bates* v. *City of Little Rock, supra,* 361 U.S. 516, 524 [80 S.Ct. 412, 4 L.Ed.2d 480, 486], stated that "Decision in this case must finally turn, therefore, on whether the cities as instrumentalities of the State have demonstrated so cogent an interest in obtaining and making public the membership lists of these organizations as to justify the substantial abridgment of associational freedom which such disclosures will effect. Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." *Schneider* v. *State, supra,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155], was decided only after a conscious weighing of interests. *Talley* may be read as holding that weighing may be dispensed with when considering a restriction of unlimited potential scope, or that the outcome was so clear that the balancing was not made explicit, or that there was no competing interest to weigh.[12] Justice Harlan, concurring, expressly states that the court has " 'the delicate and difficult task' of weighing 'the circumstances' and appraising 'the substantiality of the reasons advanced in support of the regulation of the free enjoyment of' speech." (*Talley* v. *State of California, supra,* 362 U.S. 60, at p. 66 [80 S.Ct. 536, 4 L.Ed.2d 559, at p. 564].) Cases subsequent to

---

[12]"Counsel has urged that this ordinance is aimed at providing a way to identify those responsible for fraud, false advertising and libel. Yet the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose." (*Talley* v. *State of California, supra,* 362 U.S. 60, 64 [80 S.Ct. 536, 4 L.Ed.2d 559, 562].)

*Talley,* e.g., *Communist Party* v. *Subversive Activities Control Board, supra,* 367 U.S. 1 [81 S.Ct. 1357, 6 L.Ed.2d 625]; *Shelton* v. *Tucker, supra,* 364 U.S. 479 [81 S.Ct. 247, 5 L.Ed. 2d 231]; see also *Speiser* v. *Randall,* 357 U.S. 513, 525 [78 S.Ct. 1332, 2 L.Ed.2d 1460, 1472] ("line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished"), have involved a consideration of the competing interests and recognized that First Amendment rights are not absolute.

The recent decision in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] emphasizes anew the great value of comment, even to the point of "vehement, caustic, and sometimes unpleasantly sharp attacks" (376 U.S. at p. 270 [84 S.Ct. at p. 721, 11 L.Ed.2d at p. 701]), on the *"official conduct"* of government officials. (Italics added; this phrase is repeated frequently throughout the opinion.) However, as was made explicit by Justice Goldberg, concurring, "This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen." (376 U.S. at p. 301 [84 S.Ct. at p. 737, 11 L.Ed.2d at p. 721].) The court recognized a difference between "an otherwise impersonal attack on governmental operations" and "a libel of an official responsible for those operations." (376 U.S. at p. 292 [84 S.Ct. at p. 732, 11 L.Ed.2d at p. 713].) California, too, has given recognition to the importance of criticism of the conduct of public officials in the administration of their offices. (E.g., *Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 P. 1]; *Babcock* v. *McClatchy Newspapers,* 82 Cal. App.2d 528 [186 P.2d 737].) The *Times* case held that a public official cannot recover damages "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" (376 U.S. at p. 279 [84 S.Ct. at p. 726, 11 L.Ed.2d at p. 706].) With the threat of a libel suit significantly diminished, the need for anonymity is less now, and the need for the protection of the public from scurrilous attacks on candidates is still greater since, presumably, the threat of a libel action had previously acted as something of a deterrent against such attacks. Moreover, unlike the case of a libel action, prosecution under section 12047 must be accompanied by all the safeguards prerequisite to a criminal case, a distinction noted by the court in *Times.*

We recognize full well the considerations noted in *Times,*

at pages 726, 727 [84 S.Ct. at p. 726, 11 L.Ed.2d at p. 707], in the quotation from *Coleman* v. *MacLennan*, 78 Kan. 711, 724 [98 P. 281, 130 Am.St.Rep. 390, 20 L.R.A.N.S. 361] : " ' [I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged.' "

There is a crucial difference, however, between the interests at stake in a libel case and those involved in the enforcement of a purity of elections statute. In the former, we juxtapose against free speech the risk of harm to the reputation of an individual. Even here, the majority permit redress if there is present actual malice. However, the disclosure requirement of section 12047 does far more than protect the reputation of candidates. It furthers the very ends sought to be achieved through the right of free speech, to wit, "that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means." (*De Jonge* v. *Oregon*, 299 U.S. 353, 365 [57 S.Ct. 255, 81 L.Ed. 278, 284].) This end is attained when the will of the people is an undeceived, well-informed will. "The effective functioning of a free government like ours depends largely on the force of an informed public opinion." (*Barr* v. *Matteo*, 360 U.S. 564, 577 [79 S.Ct. 1335, 3 L.Ed.2d 1434, 1444] (concurring opinion).) The freedoms of the First Amendment, however, not only foster legitimate government, but also depend on its survival. While we recognize that "the fitting remedy for evil counsels is good ones" (*Whitney* v. *State of California*, 274 U.S. 357, 375 [47 S.Ct. 641, 71 L.Ed. 1095, 1106] (Justice Brandeis, concurring)), and that "Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly" (*Wood* v. *Georgia*, 370 U.S. 375, 389 [82 S.Ct. 1364, 8 L.Ed.2d 569, 579]), we must also be cognizant of the realities of the specific problem here dealt with. Adequate dissemination of rebuttal or refutation is virtually impossible in the situation of preelection attacks.

The heat of an election campaign and limitations of time work against the effective use of "counterargument and education." Moreover, evaluation of the source of the statement, and of the motivation of its proponents, are part of "education." While "It is plain that anonymity has sometimes been assumed for the most constructive purposes" (*Talley* v. *State of California, supra,* 362 U.S. 60, at p. 65 [80 S.Ct. 536, 4 L.Ed.2d 559, at p. 563]), anonymity all too often lends itself, in the context of attacks upon candidates in the preelection period, to smears, as a result of which the electorate is deceived. Identification permits confrontation and often makes refutation easier and more effective. It tends to reduce irresponsibility. It enables the public to appraise the source. This principle was recognized by Justice Black when he said, in a case dealing with a federal statute requiring registration of certain agents of foreign principals: "Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment." (*Viereck* v. *United States,* 318 U.S. 236, 251 [63 S.Ct. 561, 87 L.Ed. 734, 743] (dissenting opinion).)

"[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker, supra,* 364 U.S. 479, 488 [81 S.Ct. 247, 5 L.Ed.2d 231, 237].) Section 12047 certainly "bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification." (*Bates* v. *City of Little Rock, supra,* 361 U.S. 516, 525 [80 S.Ct. 412, 4 L.Ed.2d 480, 487].) Its scope is tailored to fit its purpose. It is limited to election campaigns, to writings attacking candidates, and then only if the attack is primarily personal in nature. The ends of greater edification of the public and ability of candidates to refute or justify are both served by application of the identification requirement to good faith, truthful attacks as well as to smears.

We conclude, therefore, that the public interest in more complete information and clean, free elections, along

with the incidental benefit of maintaining an environment more hospitable to candidates for public office, exceeds the interest in the marginal decrease in freedom of expression resulting from loss of anonymity in the instances in which the statute is applicable.

However, even though the statute passes the freedom of speech barricade, the writ of prohibition must issue because the statute is unconstitutionally discriminatory. This defect, as well as the ambiguities above mentioned, can be easily cured by legislative amendment. Although the statute is, by its terms, applicable to ''Every person,'' its identification requirement can be satisfied only if the writing bears the name and address of either (a) two officers of the organization issuing it, or (b) ''some voter of this State, who is responsible for it.'' Thus, identification of an individual who issues such a writing complies with the requirement only if that individual is a California voter.[13] All other individuals who issue such a writing can comply with the statute only by obtaining the consent of a California voter to be responsible for it, and apparently need not publicly identify themselves. Thus, the purposes behind the identification requirement would not be accomplished. But more importantly, this unconstitutionally infringes upon the right of free speech of all individuals other than California voters. The requirement that such a person must find a California voter who will accept responsibility for the writing before it may be issued is an invalid prior restraint on freedom of expression. While it may be permissible to prohibit anonymity, it is a far different matter to impose an arbitrary censorship requirement.

The statute may not, in an effort to avoid this difficulty, be construed as applying only to voters, i.e., that nonvoters may publish such writings anonymously. Not only does the statute expressly apply to ''Every person,'' but we note that section 12049,[14] a parallel disclosure statute with respect to writings dealing with ballot issues, discussed

---

[13]Elections Code, section 21, defines ''voter'' as ''any elector who is registered under the provisions of this code,'' and section 20 defines ''elector'' as ''any person who qualifies under section 1 of article II of the Constitution of this State.'' Thus, the term ''voter'' is narrow and describes a group of constantly changing composition.

[14]Section 12047 was originally enacted in 1901, in language substantially identical to its present terms. Section 12049 was enacted in 1959; and both sections were codified without change in the 1961 recodification of the Elections Code.

above, is satisfied with the identification of "any *individual* responsible for it, if issued by an individual or individuals," (italics added) not any *voter*. Moreover, construction of the statute as requiring identification only by voters would result in an arbitrary classification, placing the burden of identification only upon voters—a classification without reasonable relation to the purposes of the statute. Surely it cannot be said that voters are a more likely source of scurrilous attacks than nonvoters. The aims of deterrence of smear attacks and greater public enlightenment are in no way served by such a classification, but rather the underinclusion is inconsistent with the statutory purposes. Such a construction would limit the number of persons required to identify themselves to a shifting group consisting of less than half of the state's population. The validity of a classification must appear clearly when a fundamental right is involved. (*Skinner* v. *Oklahoma,* 316 U.S. 535 [62 S.Ct. 1110, 86 L.Ed. 1655]; see also McKay, *Political Thickets and Crazy Quilts: Reapportionment and Equal Protection,* 61 Mich.L.Rev. 645, 665-677.) Therefore, the statute is susceptible only of the interpretation that its requirements apply to all persons issuing such writings.

 As the case is before us on prohibition, before trial, there is nothing to indicate whether or not appellant is a California voter. If he is not, the constitutional guaranties of free speech preclude enforcement of the statute against him. If he is a California voter, may the statute be enforced against him? We hold it may not. The derogation of the freedom of speech of nonvoters is so palpable that all may rely on the fact that the statute may not be enforced against nonvoters. (See *People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 726 [264 P.2d 31].) This being so, we are left with a statute which applies only to voters, and, thus, one which results in an arbitrary classification. If a voter, appellant is a member of the class discriminated against, and may claim protection against such governmental action. In so doing, appellant asserts his own right to freedom from arbitrary classification, he does not rely on the rights of others.

The judgment is reversed and the cause is remanded to the superior court with instructions to issue the peremptory writ of prohibition.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Tobriner, J., and Peek, J., concurred.