**STATE of North Dakota, Plaintiff and Appellee,**

v.

**NORTH DAKOTA EDUCATION ASSO- CIATION, Defendant and Appellant.**

**Crim. No. 612.**

Supreme Court of North Dakota.

Feb. 16, 1978.

Chapman & Chapman, Bismarck, for defendant and appellant; argued by Daniel J. Chapman, Bismarck.

Rolf P. Sletten, Asst. State's Atty., Bismarck, for plaintiff and appellee.

VOGEL, Justice.

This is an appeal from a conviction of the appellant of a violation of Section 16–20–17.1, N.D.C.C., which reads:

"16–20–17.1. Political advertisements to disclose name of sponsor.—Each and every political advertisement, whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure or constitutional amendment, and whether such advertisement shall be by newspaper, pamphlet or folder, display cards, signs, posters or billboard advertisements, or by any other public means, shall disclose at the bottom of same the name or names of the sponsors of such advertisement, and the name or names of the person, persons, associations, partnerships or corporations paying for such advertisement, except however, this section shall not apply to campaign buttons. At the close of every radio or television broadcast containing any advertising announcements or talk for or against any candidate for public office, any initiated measure, referred measure, or constitutional amendment to be voted on by the people, there shall be announced at the close of said broadcast the name or names of the person, persons, associations, partnerships or corporations paying for such radio or television broadcast."

The penalty for violating Section 16–20–17.1, N.D.C.C., is specified in Section 16–20–17.2, N.D.C.C., which reads:

"16–20–17.2. Penalty.—Any person, association, partnership or corporation who shall violate the provisions of section 16–20–17.1 and who shall fail or neglect to disclose the name or names of the sponsors of such political advertisement, or the name or names of the persons, associations, partnerships or corporations paying for such advertisement, or who shall print, distribute, or cause to be printed or distributed, any matter described in section 16–20–17.1 hereof which does not comply with the provisions of section 16–20–17.1, shall upon conviction thereof be punished by imprisonment in the county jail for not less than thirty days or more than six months, or by a fine of not less than one hundred dollars or more than five hundred dollars, or by both such fine and imprisonment. Any editor of a newspaper, managing officer of any printing establishment, radio station, novelty concern, poster or billboard advertising company printing or furnishing such political advertisement without disclosing the information as provided in section 16–20–17.1 shall also be liable to the penalties prescribed herein."

Upon conviction after a jury trial, sentencing was deferred until June 21, 1978, subject to the condition that the appellant not violate the law for one year.

The appellant is an association of a great majority of the classroom teachers of North Dakota. It distributes a publication known as the "North Dakota Education News" six times a year to its members and to other associations on its exchange list, to newspapers, radio and television stations, to all legislators, and to all libraries throughout the State. Once a year it also distributes the publication to all classroom teachers in North Dakota, members and nonmembers alike. The publication involved in this case included all classroom teachers in North Dakota.

In its edition of August 27, 1976, it printed an appeal for a "no" vote on Initiated Measure No. 1 which would have limited the State's total expenditures in each biennium. The appeal covered about four-fifths of a printed page and did not contain a disclaimer such as is required by Section 16–20–17.1, *supra,* if applicable.

Mr. Robert McCarney, the primary sponsor of Initiated Measure No. 1, signed a complaint against the Association, alleging a violation of Section 16–20–17.1, and the case went to trial before a jury and resulted in conviction. This appeal followed.

The Association asserts (1) that the publication was not a newspaper or otherwise included within the description of means by which the statute could be violated; (2) that the appeal to vote against Initiated Measure No. 1 was not an "advertisement" within the meaning of the statute; (3) that there was no "public distribution" of the publication; (4) that the court erred in failing to instruct the jury on culpability; (5) that the court erred in failing to define "newspaper"; and (6) that the statute is unconstitutional as violative of the First Amendment of the Constitution of the United States and Section 9 of the Constitution of the State of North Dakota relating to freedom of speech.[1]

We hold that the statute is violative of the State and Federal Constitutions.

## I

■ The publication in question has the appearance of a newspaper, but we need not decide whether it is a newspaper or not. Even if not a newspaper, it is within the description "any other public means" forbidden by the statute. A publication distributed to the broad readership to which this one is sent is a "public means" of distributing the views of the publisher, in our view.

## II

■ Again, the questioned appeal to vote against Initiated Measure No. 1 has the appearance of an advertisement. The publication in question accepts advertising from commercial advertisers. The issue of August 27, 1976, which contained the appeal to vote against Initiated Measure No. 1, contained advertisements from Blue Cross/Blue Shield of North Dakota, Northern School Supply Company, and others who sought to make a favorable impression on the members of the Association. In appearance the appeal to vote against Initiated Measure No. 1 is no different from the advertisements of the commercial advertisers. We hold that it could properly be held an "advertisement" within the meaning of Section 16–20–17.1, N.D.C.C.

## III

We also have no doubt that there was a distribution by "public means" of the publication. It was not only sent by mail to members of the Association, but also to prospective members, members of the Legislature, and public libraries. This is sufficient. See *State v. Reisler*, 194 N.W.2d 230 (N.D.1972), in which we held that a distribution to one person of one copy of a pamphlet did not constitute a distribution. However, we held:

"We construe the word 'distribute' in its ordinary and normal sense to mean a distribution or dispensing of the prohibited material to the public generally, or to a considerable number of people, designed to affect the results of an election." 194 N.W.2d at 233.

The publication in question was distributed to a considerable number of people. It was intended to be read by a substantial segment of the public, including library patrons. The appeal for votes against the Initiated Measure was made by a "public means."

## IV

■ The Association asserts that the court erred in failing to instruct the jury that the degree of culpability which must be proved by the State is "willfully," citing Section 12.1–02–02, N.D.C.C., subsection 2 of which provides:

"2. If a statute or regulation thereunder defining a crime does not specify any

---

1. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Amend. 1, U.S.Const.

"Section 9. Every man may freely write, speak and publish his opinions on all subjects, being responsible for the abuse of that privilege. . . ." N.D.Const.

culpability and does not provide explicitly that a person may be guilty without culpability, the culpability that is required is willfully."

However, Section 12.1–02–02, N.D.C.C., is a part of a recodified criminal code, and applies only to that code. It does not apply to earlier statutes which were not repealed by the codification, such as the statute under consideration in this case.

Section 16–20–17.2 contains no requirement as to the degree of culpability. It is a statute which provides for a penalty for the doing of an act, regardless of willfulness. See *City of Dickinson v. Mueller*, 261 N.W.2d 787 (N.D.1977).

There was no error in the court's failure to instruct on willfulness.

## V

■ "Newspaper" is a common term, readily understood. As such, it need not be defined, particularly in the absence of a request for definition. *State v. Piper*, 261 N.W.2d 650 (N.D.1977); *State v. Motsko*, 261 N.W.2d 860 (N.D.1977).

Furthermore, advertising by newspaper is only one of several alternative methods of violating the statute, including pamphlets or folders, display cards, signs, posters or billboard advertisements, or by any other public means. We believe all of these terms are commonly understood by intelligent jurors and need not be defined, although the trial court may do so if it wishes.

## VI

■ We turn now to the constitutionality of Section 16–20–17.1.

The parties cite various decisions of other courts which are not directly in point, including *State v. Barney*, 92 Idaho 581, 448 P.2d 195 (1968), and *Canon v. Justice Court for Lake Valley Jud. Dist.*, 61 Cal.2d 446, 39 Cal.Rptr. 228, 393 P.2d 428 (1964). At our request, supplementary briefs were filed by both parties, discussing the applicability of *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). In that case an

ordinance of Los Angeles prohibiting distribution in any place under any circumstances, of handbills which did not have printed thereon the name and address of the person who printed, wrote, compiled, or manufactured them, and the person who caused them to be distributed was held to be an unconstitutional violation of the First Amendment as it related to freedom of speech.

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refusing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John Udal, were sentenced to death on charges that they were responsible for writing, printing or publishing books.[6]

"[6] Penry was executed and Udal died as a result of his confinement. 1 Hallam, The Constitutional History of England (1855), 205–206, 232.

Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day.[7] Even the Federalist Papers, writ-

"[7] In one of the letters written May 28, 1770, the author asked the following question about the tea tax imposed on this country, a question which he could hardly have asked but for his

anonymity: 'What is it then, but an odious, unprofitable exertion of a speculative right, and fixing a badge of slavery upon the Americans, without service to their masters?' 2 Letters of Junius (1821) 39."

ten in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.

"We have recently had occasion to hold in two cases that there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; *N. A. A. C. P. v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488. The reason for those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance. This broad Los Angeles ordinance is subject to the same infirmity. We hold that it, like the Griffin, Georgia, ordinance, is void on its face." 362 U.S. 64, 65, 80 S.Ct. 538.

This language appears to us to be controlling, even if we were disposed to hold otherwise, which we are not. Other courts have attempted to distinguish other statutes in the face of the *Talley* decision, with dubious success. See *State v. Fulton*, 337 So.2d 866 (La.1976), and cases cited.

The State's Attorney in the case now before us attempts to draw a distinction between the statute we are construing and the statute construed in *Talley* on the basis that the latter applied to all pamphlets, while our statute applies only to publications relating to political matters. The flaw in this argument is that the publications referred to by the Supreme Court in the language quoted above were also political, some of them being among the most profound political documents ever written

in any age. If the founders of our nation wrote the First Amendment in order to protect the freedom to write anonymous political tracts, along with other purposes, a statute which limits anonymity in political writings is just as violative of the Constitution as a statute which applies to all anonymous writings.

It is worth remembering that among the glories of our nation's history are documents written under pseudonyms by men who were to become the second, third and fourth Presidents as well as the first Vice President, the first Chief Justice and the first Secretary of the Treasury and Secretary of State of the United States.[2] We should also remember that the political tracts without which the Revolutionary War could not have been won, entitled *Common Sense*, written by Thomas Paine, were published under the pseudonym "An Englishman," which he then was, in 1776.

The cases cited by counsel do not greatly assist us. In *State v. Barney, supra*, a statute bearing some similarity to the one before us was held void for vagueness, on grounds that would not apply to our statute. In *Canon, supra*, the statute being construed forbade publications "designed to injure or defeat any candidate for nomination or election to any public office by reflecting upon his personal character or political action, . . ." unless the names and addresses of the sponsors were specified. The statute was held unconstitutional on the narrow ground that it discriminated against nonresident individuals by requiring sponsorship, if sponsored by an individual, by a California voter. However, the *Canon* court also attempted to distinguish *Talley* on the broader freedom-of-speech issue, and perhaps successfully, by pointing out that the California statute, while impairing to some extent freedom of expression, showed the necessary compelling interest (avoid-

2. James Madison, fourth President as well as Secretary of State under Jefferson, together with Alexander Hamilton, first Secretary of the Treasury under Washington, and John Jay, first Chief Justice of the United States, wrote the Federalist Papers under the name of "Publius," in 1787. John Adams, first Vice President and second President, wrote anti-British tracts, under the name "Novanglus" in 1775. Thomas Jefferson, third President and first Secretary of State, wrote a document, published anonymously, perhaps without his consent, under the title "A Summary View of the Rights of British America" in 1774.

ance of political smears and character assassination) which outbalanced the slight effect on freedom of speech.

The case before us cannot be so distinguished. Section 16–20–17.1, quoted above, is not directed against attacks on the character or actions of candidates, as the California statute in *Canon* was, nor is it directed against the publication of false information, as a different statute of this State, Section 16–20–17.3, N.D.C.C., is. The latter reads:

> "16–20–17.3. Publication of false information in political advertisements—Penalty.—No person shall knowingly sponsor any political advertisement containing false information, whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure, or constitutional amendment, and whether such publication shall be by radio, television, newspaper, pamphlet, folder, display cards, signs, posters or billboard advertisements, or by any other public means. Any person who shall violate the provisions of this section shall be guilty of a class A misdemeanor."

The latter statute is not involved in the present appeal, and we express no opinion on its constitutionality, for that reason. We mention it to show that this State does have a statute directed specifically against false advertising in electoral matters.

The wording of the statute before us, Section 16–20–17.1, N.D.C.C., differs radically from the California statute construed in *Canon*, in that our statute applies to all political advertisements, "whether on behalf of or in opposition to" candidates or measures, and applies to all types of advertisements, whether true or false. In *People v. Duryea*, 76 Misc.2d 948, 351 N.Y.S.2d 978 (1974), *affirmed* 44 A.D.2d 663, 354 N.Y.S.2d 129 (1974), the court used wording almost directly applicable here:

> "I conclude, therefore, that even granting that the compelling nature of the concern for 'the integrity of political campaigns' is sufficient to permit some limitations on totally free expression, this statute is not narrowly enough drawn to

further the State's legitimate interest. It is in no way limited to deterring campaign defamation and financing violations. It makes anonymity a crime when *anyone* (candidate, political organization, private organization or private individual) prints or distributes *any* literature 'in quantity' (poster, handbill or letter) containing *any* statement (reckless, responsible, political, personal, true, false, favorable, unfavorable, scrurrilous [*sic*] or discreet) concerning *any* candidate (declared or undeclared) or issue on the ballot (constitutional amendment or proposition) 'in connection with' *any* party or governmental election." [Emphasis in original.] 351 N.Y.S.2d 978 at 995.

We must add that we can sympathize and even agree with the motives of the sponsors of the parent statute of Section 16–20–17.1, adopted in 1945, and subsequent amendments in 1959, 1967, and 1969. The distribution of baseless, anonymous slanders, often during the last few hours before an election, is not unknown to this State. It was to deter such abuses of the electoral process, and to make it possible to obtain recompense from their authors, that such statutes as Section 16–20–17.1 were advocated and enacted. Anyone who has been victimized by anonymous smears will understand the motives of the sponsors. But constitutional imperatives must prevail and our hopes must lie in the good sense and decency of the electorate, or in the passage of a more carefully drawn statute designed to meet the specific evil.

The judgment of conviction is reversed and the defendant is ordered acquitted. The statute under which the defendant was convicted is unconstitutional. It violates both the First Amendment of the United States Constitution and Section 9 of the North Dakota Constitution.

ERICKSTAD, C. J., and PEDERSON, J., concur.

SAND, Justice (concurring and dissenting).

I agree with many of the statements regarding the purpose and objectives of the

First Amendment as stated in the opinion of Justice Vogel and with the observations in *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). I can also understand that because of the harsh sedition libel laws of England, a violation of which could subject the offender to the death penalty or loss of all property plus a long jail sentence, there was a need for anonymity at the time the Colonies were formulating and struggling for their independence from England.

It seems reasonable that because of the harsh treatment under the sedition laws of England and other related matter, Section 3, Article III, to the United States Constitution was adopted, which provides:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

"The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted."

Possibly for the same reasons, the First Amendment to the United States Constitution was adopted, which provides:

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

For the same reasons, every state constitution has a similar provision as to the freedom of speech and press concept.

North Dakota's Constitution, in § 9, provides, in part:

"Every man may freely write, speak and publish his opinions on all subjects, being responsible for the use of that privilege. . . ." [Underscoring added.]

I do not believe the inhabitants of the Colonies in the pre-independence days, experienced "our" free open elections and for this reason I cannot agree that the First Amendment was adopted and designed to assure or protect anonymity in the election process. Anonymous criticism of the Government may be protected and there may be some justification for that, but for anonymous criticism of candidates no justification exists. I recognize substantial difference between criticizing the Government and criticizing a candidate for a certain office. The question before us does not involve any criticism of the Government.

The need for anonymity is not as strong or desirable now as it was during the pre-independence days of the Colonies. We have now many constitutional protections and safeguards which will permit any individual to criticize the Government or any individual official without being subjected to a penalty or forfeiture.

"Generally speaking, freedom of speech and liberty of press are not absolute or unqualified rights, but are relative; that is, the freedom of speech and press protected by the constitution is not absolute at all times and under all circumstances, and freedom of speech or press does not mean that one can talk or distribute where, when, and how one chooses. It was never intended, and some state constitutions expressly so provide, that these guaranties were to constitute an absolute license to speak and to publish anything that one pleases, freed from all legal liability therefor, either civil or criminal. The guaranties of freedom of speech and of the press rank no higher than any other rights protected by the constitutions, and the right is to be enjoyed subject to implied limitations and restrictions, and does not afford one the right to encourage and solicit resistance to the execution of laws, or to impede, or interfere with, the orderly administration of justice." 16 C.J.S. *Constitutional Law* § 213, pp. 1102–1106.

The law in *Talley* was too broad. It was not limited to election and campaign mate-

rial, but covered "any hand-bill in any place under any circumstances." The court specifically stated:

"Therefore we do not pass on the validity of an ordinance limited to prevent these or any other supposed evils."

If the law had applied only to campaigns or elections, a different result most likely would have been reached. The court's statement in *Talley* obviously carries the thought that if a legitimate evil is to be prevented, then the law requiring disclosure would be valid. *Talley* has been so construed in *Canon v. Justice Court for the Lake Valley Judicial District of El Dorado County*, 61 Cal.2d 446, 39 Cal.Rptr. 228, 393 P.2d 428 (1964). See also a similar statement in *Commonwealth v. Dennis*, 368 Mass. 92, 329 N.E.2d 706 (1975). In *United States v. Scott*, 195 F.Supp. 440, 443 (D.N. D.1961), the district court upheld the Federal Act, § 612 of Title 18 of the United States Code, which required a disclosure on statements relating to candidates for federal office. The court in *Scott, supra*, discussed the reasoning in *Talley* before reaching its conclusion. The court said that the statute was enacted "So that the electorate would be informed and makes its own appraisal of the reason or reasons why a particular candidate was being supported or opposed by an individual or groups." The court, on page 443, posed the question,

"Is there anything sinister in requiring disclosure of identity to the end that voters may use their ballots intelligently? Is it not perfectly apparent what havoc would be wrought by anonymous publications concerning candidates enumerated under § 612?"

The court then continued,

"The Defendant's theory of fear of reprisal is highly speculative and conjectural, and it may be added, any citizen of the country could urge the same argument in like circumstances and compel the courts to attempt to forecast the danger of reprisal. The mere possibility of reprisal is not enough.

"There may always be men who might think in terms of reprisal, but there will always be courts to protect the intimidated from the intimidators.

"In a very recent case the Supreme Court of the United States in *Communist Party of the United States of America v. Subversive Activities Control Board*, (1961), 367 U.S. 1, 81 S.Ct. 1357, 1407, 6 L.Ed.2d 625 said:

' * * * *To state that individual liberties may be affected is to establish the condition for, not to arrive at the conclusion of, constitutional decision. Against the impediments which particular governmental regulation causes to entire freedom of individual action, there must be weighed the value to the public of the ends which the regulation may achieve.* (Emphasis supplied.) *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; *American Communications Ass'n v. Douds*, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925.'

"The decision of this Court on the motion before it is based squarely upon the rationale of this most recent pronouncement of the Supreme Court of the United States.

"The value to the public of the statute here under attack far outweighs the supposed infringement of the rights of the Defendant here."

I do not believe I can improve upon this.

In *Canon*, the court, with reference to the *Scott* decision, also observed:

"The court stressed that such disclosure enables voters to use their ballots more intelligently. It is to be noted that the federal statute is not limited in any manner as to the type of statement made."

In *Commonwealth v. Dennis*, 368 Mass. 92, 329 N.E.2d 706 (1975), the court had under consideration a law which required all written, printed, posted, or distributed circulars or posters designed to aid or defeat any candidate to place either the name of the chairman or secretary, or the names of two officers of the political organization, or the name of some voter who is responsible therefor. The court held that the voter requirement [name of voter who is responsible for the statement] imposed an undue

restriction upon persons and was in violation of the Equal Protection Clause. The court, however, significantly observed:

"Thus, even if the State properly could compel disclosure of the source of all such literature, § 41 restricts free expression by nonvoters. In this respect § 41 is unconstitutionally overbroad."

A comprehensive article entitled "Development in the Law—Elections" in 88 Harv. L.Rev. 1111, beginning on page 1286, contains an interesting discussion of campaign literature disclosure laws. It observes that 43 states and the federal government imposed criminal sanctions upon persons who publish or distribute anonymous campaign literature and advertisements. These laws require that the names and addresses of the author or other responsible persons appear on the communications. In a footnote on page 1291, it discusses the case of *People v. Duryea*, 76 Misc.2d 948, 351 N.Y.S.2d 978 (1974), ultimately affirmed by the New York Appellate Court, 44 A.D.2d 663, 354 N.Y.S.2d 129 (1974), which in effect held that a person has a right to be anonymous and that anonymity itself reflects on the credibility of the speaker. The statute in the *Duryea* case was similar to the one in the *Hill* case of Texas [*Printing Industries of the Gulf Coast v. Hill, Attorney General of Texas*, D.C., 382 F.Supp. 801] which required the name and address of the printer to be on the campaign material. But this was not the pivotal point in the case. The author states, however,

"If it is in fact accurate to assume that anonymous speakers are less trustworthy than speakers who voluntarily disclose their identity, the point may carry some force, but it is far from clear to what extent the underlying hypothesis is accurate. Perhaps more important, this argument would undercut the importance of disclosure only if the information provided is thought to be unidimensional, all relating to the speaker's trustworthiness. In fact, however, disclosure permits evaluation of interest, bias, and other factors

besides trustworthiness. Therefore, the fact of anonymity alone cannot be considered an adequate substitute for compelled disclosure in furthering the state interest in question."

The article also discusses *Talley v. California*, and observes that it was too broad in that it covered the distribution of all anonymous circulars. The article concludes with the following statement:

"Although the question is a close one, it appears that campaign literature disclosure requirements are constitutional."

In *Printing Industries of the Gulf Coast v. Hill, Attorney General of Texas*, 382 F.Supp. 801 (S.D.Tex.Houston Div. 1974), the court had under consideration a 1963 state statute amending Art. 14.10(b), which required "Any printed or published political advertising shall also have printed on it the name and address of the printer or publisher and the person paying for the advertising." The court held this statute invalid because it imposes an unconstitutional burden on printers, who have the right to freedom of the press and political and associational privacy, and that because none of the state's interests, many of which could be accomplished by other means, were compelling enough to justify the infringement of the printer's right. It was also held unconstitutional because the phrase "person paying for the advertising" was unconstitutionally vague.

The *Hill* case was appealed to the United States Supreme Court and a stay of judgment pending appeal was issued by the United States Supreme Court in 1974, as stated in 419 U.S. 805, 95 S.Ct. 19, 42 L.Ed.2d 33.

The case was ultimately dismissed as a result of a remand by the United States Supreme Court, as is illustrated by the following order of dismissal:[1]

"On June 30, 1975, the Supreme Court of the United States remanded this cause to this Court for reconsideration in light of the recent enactment of amendments to Article 14.10(b), Texas Election Code,

1. The order of dismissal was provided to me by the Attorney General of the State of Texas, who was the attorney representing the State in this case.

and for dismissal if the case is or becomes moot. The amendment enacted by the Sixty-Fourth Texas Legislature recodified the previous Article 14.10(b) as Article 14.09 and contained no requirement that printed or published political advertising contain identification of the printer or publisher. Since the State of Texas no longer requires the disclosure of the name and address of the printer or publisher on such advertising, the issue in this case has been rendered moot.

"IT IS, THEREFORE, ORDERED that this cause is hereby dismissed on the basis of mootness.

"Done at Houston, Texas, on this 30th day of November, 1976."

The provisions of Article 14.09, "Political advertising," as material to the situation, provides as follows:

"It is unlawful for any person knowingly to enter into a contract or transaction to print, publish or broadcast, any political advertising which does not disclose thereon that it is political advertising and which does not state thereon the name and address either of the agent who personally entered into the contract or transaction with the printer, publisher, or broadcaster, or the person represented by such agent. A violation of this provision shall constitute a Class A misdemeanor."

It makes it a Class A misdemeanor to fail to do so. In this respect it is very similar in circumstances to the North Dakota statute under consideration in this case.

We must assume that the United States Supreme Court, when it issued its remand, had analyzed the provisions of Article 14.09, as enacted by the Texas Legislature amending the previous provision, Article 14.10(b), which was under consideration. We must further assume that the United States Supreme Court was aware of the new provision and that the entire law had been challenged, and in this respect gave tacit approval to the amended version of the Texas law as found in Article 14.09. In making this comment I am aware that in the *Hill* case the statute was challenged on the

proposition that the name and address of the printer or publisher and the person paying for the advertising had to be placed on the political advertising.

In the Harvard Law Review article, Vol. 88, mentioned earlier, the author, in a footnote, states:

"In light of the closeness of the constitutional question, a state might choose to limit disclosure requirements to advertisements in newspapers, major periodicals, and the broadcast media."

The anonymous smears, related evils, and the abuses of the electoral process prompted the Legislature to enact § 16–20–17.1, North Dakota Century Code, and constitutes sufficient state interest to justify such an enactment in balancing constitutional rights.

In *People v. Duryea*, 76 Misc.2d 948, 351 N.Y.S.2d 978, 988 (1974), the following statement appears:

"It is hardly coincidental, therefore, to note at this stage that one Federal court has recently held a Federal statute similar to Section 457 (18 U.S.C. § 612) to be constitutional in the case of the now-infamous individual charged with causing the mailing of a letter printed on 'Citizens for Muskie' stationery pertaining to Senators Jackson and Humphrey in the Florida Democratic Presidential Primary of 1972."

The footnote states:

"The constitutionality of § 612 [Federal Act] has been upheld, at the district court level. (*United States v. Donald H. Segretti, infra,* without opinion; *United States v. Insco*, 365 F.Supp. 1308 [M.D. Fla., Orlando Div., 1973]; *United States v. Scott*, 195 F.Supp. 440 (D.N.D.1961].)"

The *Segretti* case was decided by the Federal District Court of Florida, Tampa Division, in 1973.

The record in the *Segretti* case discloses that the defendant moved to dismiss the indictment against Segretti on the grounds that 18 U.S.C. § 612 was unconstitutional. The court directed that both counsel for the defendant and Government file memoranda

in support of and in opposition to the motion, respectively. This was done and the memorandum in support made reference to *Talley, supra*. The defendant's memorandum also claimed that the federal statute was unconstitutional because of vagueness. The court obviously was aware of the teachings and holding in the *Talley* case before it expressed its opinion that § 612, Title 18 U.S.C., was constitutional and that the motion to dismiss was therefore denied.[2]

The *United States v. Insco* case was decided by the federal district court of Florida, Orlando Division, in 1973, and in the district court the question of free speech and press was considered as well as the contents of the *Talley* case. The district court held that the statute was not void under the constitutional guaranties of free speech and free press and the defendant was convicted. The statute in question was 18 U.S.C. § 612. An appeal was taken to the Fifth Circuit Court of Appeals, 496 F.2d 204 (1974), which reversed the conviction on the ground that the defendant was inadequately apprised by the statutory provisions of the specific prohibition of the Act at the time of his action. As such, the court did not have to resolve or discuss the challenge whether or not the statute violated the free speech-free press constitutional guaranties. The statute was not declared invalid.

One of our prize possessions is the free and open election process, the purity of which needs to be zealously guarded and protected.

The fear of reprisal, as well as the reasons why anonymity should be permitted, does not rest on solid ground and is fraught with doubt. If the prosecutor or law enforcement officials are able to find out the perpetrator of a false statement distributed on election material, certainly an official or some other person will also be able to find out who is responsible for the statement, and if they are in a position to impose reprisals, they probably will do so unless properly restrained by law.

The current status on individual rights, such as civil rights, human rights, to name a few, all of which are protected by congressional acts, does not warrant placing this country back to the situation which existed over two hundred years ago to justify anonymity. Anonymity can also be a danger which could outweigh the potential "benefits."

To rely upon the pre-independence condition of our Nation to justify anonymity, where elections, as we understand them, were nonexistent and to ignore the many improvements accomplished since then is simply being unrealistic. If we propose to support anonymity on the pre-independence conditions we must also compare the current conditions brought about by constitutional, statutory, and case law changes with the pre-independence conditions to determine if justification exists. If the conditions are not comparable, then in all probability reliance thereon is not warranted.

In balancing the right of anonymity with the right of the electorate and the candidates seeking office, I reluctantly agree as to the measures compared to persons seeking office, but the need for protection is not as great, and for this reason I agree that § 16–20–17.1, NDCC, is invalid, but only as it applies to measures, as distinguished from candidates.

In arriving at this conclusion, I recognize, as I think we must, that individuals seeking office have a right to be informed who is criticizing him or speaking against him, truthful or otherwise. The need for anonymity under our laws is not as great as it was at the time of the pre-independence of our Nation. Also, the people have a right to know who is sponsoring and supporting or opposing which candidate if they are going to make public any statements about the candidate. This is part of our election process.

A contest on or between candidates for an office can be distinguished from a con-

---

2. The United States Attorney's office of the Middle District of Florida, Tampa Division, provided me with copies of the memorandum and the court's order pertaining to the *Segretti* case.

text on whether or not measures should be adopted. See, *Canon v. Justice Court for the Lake Valley Judicial District of El Dorado County*, 61 Cal.2d 446, 39 Cal.Rptr. 228, 231, 393 P.2d 428, 431; and also, *People v. Duryea*, 76 Misc.2d 948, 351 N.Y.S.2d 978, 993.

My research discloses that no court has specifically ruled on the question whether or not a state could require a disclaimer as provided for in the statute under question here, and no court has ruled such a statute invalid. Federal statutes on this issue have been upheld.

PAULSON, J., concurs.